Insurance Corporation, argument is not to exceed 15 minutes per side. Mr. Gibbons for the appellant. Before you start, I would like to thank Judge Marbley from the Southern District of Ohio who has come here as a visiting judge to sit by designation and to permit us to have the benefit of his years of experience as an outstanding jury who has sat with our court before. So thank you so much Judge Marbley and he will of course be an integral member of our panel and with that you may proceed. Good morning. May it please the court. I'm Christopher Gibbons. I represent Max Trucking. This is our appeal as the court is well aware from a trial that occurred in the Western District of Michigan before the United States District Court. In this case, the court is presented with legal issues involving statutory construction, specifically Michigan codified law 418.161 subsection 1 and two subparts of that relating to the question of whether or not an individual who provides services to another is an employee under the act such that the act would require the provision of workers' compensation insurance. From our perspective, we have moved forward in this case from day one under the presumption that our client had a relationship with owner-operators, our client being a trucking company, had owner-operators, individuals who have legal interest in trucks, who provide service to our clients by moving freight. In fact, counsel, your client actually controlled the owner-operator because didn't the owner-operator work exclusively for Max Trucking with the exception of one owner-operator as the facts were developed below? Right. Our position is, and from our perspective, our client did not have exclusive control over these individuals. These individuals... Controls the trucks. The owner-operator controls the trucks. The owner-operator... Whose name were the trucks titled? The trucks were titled in the name of Max Trucking Company. And the lease buyback agreement, is that right? There is an enforceable lease agreement arranged between Max Trucking and the owner-operator. Who determined the routes? The owner-operator determines the routes. Who determines the points of delivery? The points of delivery are determined by the particular customers. My client acts as a broker. Those instructions are not created by my client, but rather by the opportunity that my client is out attempting to find... Your client tells the trucker where to deliver the trucks based on the agreement between the user and the broker. The bill of lading directs the driver where to go. That bill of lading is created ultimately by the customer, not my client. My client doesn't tell them how to get there, doesn't tell them where they need to get their fuel. They can buy fuel wherever they like, doesn't tell them really what to do other than abide by federal transportation rules in terms of abiding by hours restrictions that are federally mandated. That they have team drivers if necessary, if they want to operate continually. And to maintain log books that the federal government requires them to keep. My client does not require them to keep anything other than what's federally mandated. From my perspective, and from my client's perspective, MAX Trucking doesn't have control over these owner-operators. A good example of that is these owner-operators can decline work whenever they want. And there is a widespread, there are 76 different operators on any given day associated with MAX. Do the operators have their own DOT number, or do they use MAX Trucking's DOT numbers? All of the operators, whether they lease their truck from MAX Trucking, and there's only 18 to 20 of those, out of all 76 operate under MAX Trucking's DOT number. So people who own their truck, who are clearly, according to Liberty Mutual, not employees under the Act, operate under MAX Trucking's DOT number. Just as the individuals who lease trucks under a valid lease contract with MAX Trucking operate under that same Department of Transportation number. How many drivers do you have who lease these trucks from other entities, but who still drive for MAX Trucking? That information, we don't know. My client doesn't have that kind of control over these individuals. One of the problems that we encountered early on in litigation is Liberty Mutual is demanding information from owner-operators that we quite frankly don't have the ability to get, nor do we have really the right to ask for and demand. They are sole proprietors from our perspective. Do any of these truckers who work for MAX Trucking maintain a separate trucking business, to your knowledge? Three, at least three. Three out of how many? Three of the 18 disputed, I know of for sure. Whether other drivers outside of the state of Michigan are employing other people to drive the truck and handle the loads that are brokered by MAX Trucking, I don't know. But I do know that three of the dispatchers lease trucks from MAX Trucking and have hired drivers to handle that because they're in the office brokering loads, and they also have a truck that they operate for profit. In terms of the sole proprietorship, one of the points I think, and looking at the case law, the case law repeatedly says a couple of things. One is you have to look at the statute. If the statute is plain, you have to stick to that. The trial court was instructed to adhere to the language of the statute if it's clear. And secondly, in terms of making the inquiry, the court should have first gone right to these contracts. The court in this case, the trial court, at the end of the day hung its hat on the idea that, well, these drivers could not have otherwise afforded a truck, to buy a truck on their own, but for the opportunity afforded them by MAX Trucking. In the opinion of the trial court, MAX Trucking was lending its creditworthiness and its balance sheet to these truckers in order to afford them the opportunity to purchase a truck. That is, I think, kind of a misstatement, and I think it belies the actual contractual arrangement that exists between the owner-operators at issue in this case and MAX Trucking. Those individuals signed a valid and binding lease agreement. Under the laws of the state of Michigan, after 30 days of maintaining a lease, you are the record owner of that truck for liability purposes and for all other legal purposes in the state of Michigan. But you're not the title owner. The title, you don't get to pay for it, but for liability, insurance purposes, and any other legal purposes in the state of Michigan, you are considered the owner. But whether or not the title is in the lessee's name, the reality is the lessee has a very real and valid legal expectation in that contract, and more importantly, in that vehicle. Each lessee must come up with... What happens if the owner-operator fails to pay? Who gets possession of the truck? Does MAX Trucking get possession, or does some other entity take possession? Who's entitled to repossess it, Mr. Gibbons? That arrangement works exactly as it does for every other human being in this country. If you default on your lease payments, just like you might do on an apartment or a boat or anything else, if you don't make your payment every month, ultimately the lessor has the right to recover the property. So MAX Trucking takes it back? With respect to these 18 individuals, MAX Trucking would take the truck back. But there are other individuals who lease from national leasing companies, such as Ryder. If that individual is hauling for MAX Trucking as an owner-operator, if he fails to meet his expectations to Ryder, Ryder's going to come take his truck. But that's not an issue in this case, is it?  Is that part of the factual record below? There was testimony to that effect before the court in the trial, yes. That this is a lease agreement, and that there are other owner-operators who either buy from the bank or lease from another company. That's the distinction in this case. I think it's the distinction without a difference. Because the idea here is that somehow these drivers who lease from MAX Trucking are different than drivers who lease or purchase from a third-party bank. But the reality is they're under the same economic pressure to perform on their legally binding contracts, just as everyone else is. But if you are from Huntington or through Huntington, and you don't work for Huntington, doesn't that distinguish what happens in this case? Because these owner-operators work by and large for MAX Trucking, didn't they? They choose to work with MAX Trucking. Whether they choose to or not, they work for MAX Trucking, don't they? They do, yes. We don't dispute that. But what I do have a problem with is the idea that somehow that these leases for these 18 individuals are shams, because MAX Trucking could just violate the lease whenever it chooses as though it doesn't exist, and that these are really artificial entanglements here that are meant to somehow obfuscate the rules. We're talking about less than 20% of the drivers that my client employs in terms of owner-operators as independent contractors. If this were a broad-form scheme to avoid workers' comp, wouldn't he have all of them on this program? And to get back to my point, if MAX Trucking were to just say, I don't like you anymore, I'm glad you made your payments, thank you for the $4,000 downstroke, but I'm taking your truck, that person would have the right to sue my client for breach of contract. So at the end of the day, I think it is a distinction without a difference. And the reason for that is that there's a contract here. This isn't a bare, here, take the truck and keep it as long as I say you can have it. These individuals, as long as they pay for the truck, have the ability to maintain the truck, they're responsible for the truck, if the truck breaks they have to fix it. They are able and they do, in fact, in a very real way, prepare tax returns every year, where they take deductions for fuel, repairs, maintenance. All of those things are controlled by the owner-operator. When you're done there, what is the legal test that we should utilize to decide if these drivers are employees? Is it just MCL Section 418? I think that the statute that controls here, by virtue of where we're at, is Section 1611 sub N, and I think that the court's review was limited to the revenue ruling, because I think under the plain language of the statute, it says clear as a bell, in language I think that is clear and understandable, on or after January 1, 2013, workers' compensation eligibility is determined by the revenue ruling. There is no preservation language. In addition to the established common law definitions or the prior statutory definitions, we're going to add the revenue ruling as another layer to the onion of examination. It simply says the revenue ruling is it. That's what you're saying that the district court said? No, that's what I say the statute says. The district court said it was a blend, that somehow we took the old standard, which was the first paragraph of that statute, Section N, with the three standards, and we added that, so we have kind of a super definition. The three-factor test wasn't eliminated by the amendment, was it? Pardon? The three-factor test wasn't eliminated by the amendment. From our reading, it is eliminated, because that statute was passed in 2011. So in 2011, it says, here's the deal, you've got to look at these three factors. If you're any one of these three, you're out. Then it says, on or after January 1, 2013, is the revenue ruling. But the legislature could have amended the first sentence of 161N1 to read that it would only apply until January 1, 2013, but it didn't, did it? No, it didn't. But I don't think they would have to, to necessarily get the result. Because there isn't anything that preserves it. It should have said, it seems to me, if the legislature intended the revenue ruling to be a supplemental inquiry, it would have said so. It would have said, in addition, on or after January 1, 2013, you can also consider the revenue ruling. It says, on or after January 1, 2013, the revenue ruling is it. It makes no savings. It seems to me the rule of construction is, to the extent things are different in an amendment, it cancels anything prior to that was contradictory or different and not consistent. All right. I think we have your argument in hand. Thank you very much, Your Honor. Thank you, counsel. Good morning. Good morning. Police Department, I'm Graham Crabtree, appearing on behalf of the defendant affiliate Liberty Mutual. We contend, as we have suggested in our brief, that Judge Yonker's findings, all of them were well supported and should be affirmed. We have a situation where our client is required, has been chosen to provide the workers' comp insurance to Max Trucking through the involuntary market through the placement facility. And the problem that Liberty Mutual has is that when they provide this insurance, they are obligated to provide workers' comp benefits for any employees that are found after the fact to be employees if an injury requiring benefits comes up. So there had to be an audit at the conclusion of the policy term to find out which of these people working for Max Trucking were indeed employees as opposed to independent contractors. And according to the rules of the facility, that was the appropriate required way to determine premium. It is a question which is determined not as a matter of tax law, but based on the language of the Michigan Workers' Compensation Statute, and the relevant statute is 418.161. As I've pointed out, it's a lengthy section. There are a number of provisions dealing with other situations that don't apply here, but there are a couple that do apply here, and our Supreme Court in Michigan has said that these two provisions need to be considered together. The first one, there really isn't any issue about I don't believe. It applies to every person in the service of another under any contract of hire, and it's never been suggested that that doesn't apply. What we come down to is the definition of employee set forth in 418.161 sub 1 sub n, and that includes this rather awkwardly phrased test that an employee includes every person performing service in the course of the trade or business of an occupation of an employer if, in relation to that service, there are three negative conditions that are satisfied, and they're set out if the person in relation to the service does not maintain a to and render service to the public and is not an employer subject to this act. Now, our Michigan Supreme Court has held recently that to qualify someone as an employee under that provision, you do have to satisfy all three of those. But if you look at Judge Jonker's opinion, you'll see that he found that each of those three conditions were satisfied in this case, that they were performing service in the business of max trucking. In relation to that service, they did not maintain a separate business. There was no evidence that any of them did that. They did not hold themselves out to and render service to the public. They were working exclusively for max trucking company, although there was testimony that said that if one of these so-called owner operators had chosen to work for someone else, they could have taken that truck and worked for somebody else. But they would have had to cover up the max trucking decal, and they would have been required to operate under some other company's DOT authority or get their own authority. But none of them, as I've heard my counsel acknowledge, none of them had that authority on their own. And as a practical matter, none of them did work for any other companies. There was one individual, I believe, that left the employee of max trucking company and went to work for somebody else, and he took the truck with him. He continued to make his payments, and so that was just fine with max. But they got rid of the max trucking logo, and this driver operated from that point on under the authority of the new employer. So there were none of these people that were holding themselves out to the public as an independent trucking company. And there was no evidence that any of them were themselves employers subject to the act. There was testimony that for a brief time there were three dispatchers who had hired drivers to drive for them. Now, those dispatchers were already considered employees by virtue of the fact that all dispatchers were considered employees of the company. But it was their drivers that they hired for which premium was owed, because under the Michigan Workers' Compensation Law there is pass-through liability. If you have a contractor who has uninsured subcontractors working, premium is owed for those uninsured subcontractors. So the premium was owed for whichever drivers would have been hired during that short period of time to work for those dispatchers. So I think Judge Yonker appropriately found that that test was satisfied. Well, what about this additional language that has been focused on so heavily? It's a little bit of a mystery what the legislature intended in 2011 when they added this language. On and after January 1, 2013, services are employment if the services are performed by an individual whom the Michigan Administrative Hearing System determines to be in an employer-employee relationship using the 20-factor test. It doesn't say that a person is not an employee if the 20-factor test isn't satisfied. The legislature left intact the original three-part test that we've just been speaking of. And as I've pointed out, in Michigan under the Constitution, when a statute is amended, it is reenacted and republished at length, which is why bills in the Michigan legislature are so long. They had to put forth the whole thing, and it was republished. They didn't change that or limit it in any way. And I've pointed out a few examples in my brief of how the legislature does that when it's their intention to do that. They would have said something, you know, except as otherwise provided in this section, or until January 1, 2013, every person, blah, blah, blah. And then on and after January 1, 2013, employer-employee status shall be determined according to this 20-factor test. The legislature, as I've also pointed out and made it clear, this was to apply prospectively, which is in accordance with the general rule in Michigan. And the language suggests that. On and after January 1, 2013. So you have a requirement, first of all, that there be a determination made by this Michigan administrative hearing system and an administrative procedure, which simply doesn't apply here. And that's a limitation that my brother counseled asking this court to disregard. And as your honors know, our Michigan Supreme Court is very much inclined to follow exactly what the legislature has said and to apply statutes as they're written. They are loath to read in any limitation that has not been supplied or to take out anything that the legislature did put in. They will not look at a piece of language and say that that language has no meaning. So if counsel is asking you to disregard this limitation that the determination be made in an administrative proceeding, he's asking you to disregard and render nugatory that language that the legislature put in. With respect to the first test, he's asking you to read in a restriction that the legislature could have put in but didn't, except as otherwise provided, or until January 1, 2013. Going forward, Mr. Crabtree, how do the two tests coexist? The district court seems to have used the 20-factor test. I don't think it was blended as Mr. Gibbons suggested. He said in the alternative. Even if I were to apply the 20-factor test, I'd get to the same result. So going forward, how do these two tests coexist? I think going forward for services that are provided after January 1, 2013, which these were not, if there is a procedure involving a workers' comp claim in the administrative system before the Michigan Administrative Hearing System, the administrative body is going to consider that 20-part test. And I think Judge Junker got it exactly right. He said this is an alternative way of finding employee status because the old test is still there. It hasn't been eliminated and it hasn't been limited. And I think Judge Junker was maybe as confused about all this as all the rest of us were. I tried to find what the legislature was thinking by looking at their analyses and the journals, and this is one of those enactments where that search just really didn't turn up anything. But based on the language that they did use, it appears to me that it is something that is to be applied in conjunction with the other test. The test in the first sentence has to be applied. Our Supreme Court has said that, made that very clear. It says on and after January 1, 2013, services are employment if the services are performed by an individual, et cetera, et cetera, under the 20-factor test. So it doesn't say that if that test weighs the other way that they're not considered employees. Can you imagine a scenario where a court or an ALJ could apply both tests and reach different results? And if that happens, how is that reconciled? Well, I think, again, he's required to apply the language of the first sentence. That test is still there, and his determination will be informed. I think he can find it. If she applies the first test, the three-factor test, then does she automatically have to then apply the 20-factor test to pressure test the three-factor test? Does she apply the 20-factor test to supplement her findings on the three-factor test? I'm asking you, how do we do it? What are you suggesting? Well, it would appear to me that if the first part of the test is satisfied, then that person is an employee. Every person performing service in the course of a trade, business, profession, or occupation, if in relation to that service, one, two, three. If all three of those are satisfied under that part of it, the person is an employee. And if that is the case, if that ends the inquiry, it doesn't seem to me that it's necessary to go beyond and consider that 20-factor test. If the 20-factor tests were considered, and upon the weighing of all those many factors, the administrative law judge would say, Well, under these 20 factors, it doesn't really look like under that test this person would be an employee. I don't believe that, under the language as I read it, I don't believe that would change the fact that that first test is controlling and would have to be followed. But that is a question I guess is going to have to be determined as the courts in Michigan, and perhaps this court again, explore how this all works in application. So Judge Yonker said this is an alternative way of addressing this. But then he went on to say, But even under the 20-factor test, I still find that they're employees. And he didn't go through and analyze each and every one of them. And as I've said, that really shouldn't come as a surprise to anybody because Max Trucking's expert didn't go through and apply all of them either. He said, I find that, you know, based on two factors alone, I find that they're employees. The fact that they can turn down work and the fact that because, you know, based on his finding that these drivers were owners of the trucks, even though they were registered to Max Trucking, well, Max Trucking didn't provide them a place to do their work. And, you know, that finding I think is suspect because in light of the very nature of the work that's being done, there's not an office you come to, there's not a place you sit down and assemble goods. The nature of the business is you're out delivering freight. And in this case, they're delivering freight for various companies that want freight delivered. And it's arranged through brokers. And all of these people are working, they're employed by Max Trucking Company and on a regular and continuing basis. And I think Mr. Kovacevic testified that, you know, 50% of these drivers had been with Max Trucking for more than five years. And the testimony did show that they're not out delivering freight for anybody else. They're free to go and do that if they choose, but only one person did it. But our auditor determined that these are employees, this group, because of the fact that they are buying the trucks. They don't own the trucks. Yes, they have a lease-to-purchase program, and at the end of it, after they've made all their payments, they will then be entitled to buy it for a dollar. But in the meantime, the trucks are owned by Max Trucking Company. They're registered to Max Trucking Company or the bank. And they're insured by Max Trucking Company. They are assets of Max Trucking Company. And when this gets paid off and the truck gets purchased for a dollar and it's going to be the asset completely owned by the driver, then that driver is not going to be considered an employee anymore. The other drivers who have purchased their trucks elsewhere have not been claimed to be employees. So when they purchase their trucks and are done, they'll join that other group. But until they do, they are deemed to be employees. And I see that my time has expired, so I will... That makes it sound as though the issue of the ownership of the truck is the principal determining factor in determining whether an individual is an employee or not, and the other factors sort of fall away when the person acquires ownership of the truck. Is that really what you want to take as your position in all this? Well, that's the position, evidently, that our client has. They have not made an issue about the other drivers. It's understood that they're independent contractors, but they're focusing on these drivers that are in the process of purchasing the truck. And then you look at all of the other factors as well, the three-part test, which is satisfied. And if you're going to apply the 20-part test, that's all about is there control. Based on what you're saying, it sounds as though the other factors become irrelevant if the driver acquires ownership of the truck, because then he's no longer an employee just based on that event alone, which is unusual. Well, not unusual, but that sort of makes these other factors not as germane, I would say. They would be germane if our client had chosen to draw the line somewhere else. If they had looked at those other drivers and said, well, even though you own the truck, you're still under control of Mack's Trucking Company. And as I pointed out in my brief, there are a number of criteria that suggest that there is control. They work exclusively with Mack's Trucking Company. They do have to report in daily, and that's for the purpose of arranging these loads. And, yes, they do have the ability to say, I won't take that load. But if a driver of Mack's Trucking is off in the part of the country where a load needs to be picked up, I think it's reasonable to expect that they will be expected to pick up that load unless they have a pretty good reason not to. And if there's a history of saying, well, I don't feel like taking that load today, and I don't really care if there's anybody else in the area that can take it, that person's career with Mack's Trucking is going to be cut short. All right. I'd be happy to answer any other questions that any of you might have. Apparently there are none. All right. Thank you. Thank you very much. Mr. Gibbons, did you reserve time? Three minutes, sir. All right. I would like to first just address a couple of factual assertions that were made by Brother Counsel at the end there, indicating that drivers are required to report daily. They are not required to report daily. He also indicated that if drivers refuse loads, it only seems reasonable that those drivers would have a short term with my client. Just saying they're not required to report daily, I don't know what that means. Does that mean they have to report? Obviously if they never report, they're not going to stay with Mack's Trucking. Does that mean they can report every other day or they don't report if they're ill? What do you mean by that? There are drivers who are paid gross 1099 receipts for their percentage plus their expenses. They're paid that. That 88% amounts to $17,000 in a year. And there are other drivers, owner operators, who have the same 1099 for the same annual period. That's in excess of $200,000. So it just depends on how much they want to take. They have some older drivers who are semi-retired who say, I don't want to drive in the winter, and they don't. There are some who say, I'm going. Many of my clients are from Bosnia. They were refugees. They return home for a month or two at a time. There's no issue with that with Mack's Trucking. They contact the drivers for loads. Are there some rules? I don't think the trucking company would let them continue to lease the trucks if they're not performing. As long as they make their payment, they don't have to drive. That was the testimony that was uncontroverted in the trial. The auditor for Liberty Mutual could cite no instance in which Mack's Trucking took back a single truck from a driver who was current on his lease payments, and if my memory serves me correct, I don't think there was a single instance when a truck was taken back by Mack's Trucking over the will of the lessee owner operator. And it gets to your point, because you're saying, hey, if these guys, if this is a blind test, so if we put all the contracts out and we take all the names of the lessors or the sellers off, all of these drivers are treated exactly the same. Well, wait a minute now. It's one thing if they don't take back the truck because they're making the lease payments, but it also could be the fact that they're making the lease payments, but they're also performing. They're also working on a regular basis. No, no. Mr. Kovacevich's clear testimony was if they make the payments, they keep the truck. Mack's Trucking doesn't have an interest necessarily whether they operate the truck for them. But it begs the question, though, because these drivers still carry loads for Mack's Trucking. Doesn't Mack's Trucking appeal to the side of the truck? Individual names don't appeal to the side of the truck. It's on all 75 or so trucks. We're talking about the 18. It's on the 18 plus the 56 other drivers that are out there that own or lease from a third party. Do you have examples of drivers who didn't work on behalf of Mack's Trucking and made the payments and kept the truck? Several drivers sold their truck for what they owed Mack's Trucking and left the business. There is one, at least, that my client is aware of that went to haul for another company and continued to make payments. And when he finished making his payments, he was given the title to as he was entitled to under contracts. The opposing counsel says if they ceased working for Mack's Trucking and took the truck somewhere else, they had to take down the Mack's Trucking name and make some adjustments along those lines. Well, that's because they would be operating for another company, something they have a right to do. But what they don't buy is they don't buy the authority of Mack's Trucking to drive in perpetuity however they see fit. All of these owner-operators operate under Mack's Trucking authority. And what I would like to say is this in a concluding remark and how I would look at this, and I think it's helpful, is is there evidence in this case of economic compulsion? Because the difference between, if there is a difference between people who lease from Mack's Trucking and the 56 others who have third party sources for their trucks, is there an element of economic compulsion with regard to these 18 drivers that doesn't exist with the rest of the drivers? Because it is clear that they're not employees, these other drivers. What do you mean by economic compulsion? Well, the idea is, and I think what counsel was alluding to, is because they lease from Mack's Trucking, Mack's Trucking has some additional element of control over these drivers such that they are now not subcontractors but employees. Because if they lease their truck from Rider, Liberty Mutual says it's clear they would be independent contractors. So the only reason that they are employees, in their mind, these 18 drivers, is because they lease from Mack's Trucking. That's the only difference between all of them. One single difference. And it seems to me that that difference must... You might want to wrap up because your red light's been on for a while. Very good. I can do that. But in any event, I think economic compulsion, there was no evidence of that in the trial record, not a single instance of Mack's Trucking overcoming the will of any of these drivers or violating any of the valid lease agreements that they had signed with their owner-operators. Thank you. All right. Thank you very much, and the case is submitted.